**William V. WENGER, Plaintiff–Appellant,**

v.

**Paul D. MONROE, Jr., in his official capacity as Adjutant General of the California National Guard; California National Guard, Defendants–Appellees.**

**No. 00–56696.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 5, 2002.

Filed March 4, 2002.

As Amended on Denial of Rehearing and Rehearing En Banc April 17, 2002.*

---

* Judges O'SCANNLAIN and SILVERMAN have voted to deny the petition for rehearing en banc. Judge REED recommended the petition for rehearing en banc be denied.

Dennis A. Winston, (argued), and Nelson E. Brestoff, Moskowitz, Brestoff, Winston & Blinderman LLP, Los Angeles, CA, for the plaintiff-appellant.

Bill Lockyer, Attorney General of California, Margaret A. Rodda, Senior Assistant Attorney General, Richard Rojo, Supervising Deputy Attorney General, Christina Bull Arndt, (argued), Deputy Attorney General, Los Angeles, CA, for the defendants-appellees.

Before: O'SCANNLAIN and SILVERMAN, Circuit Judges, and REED,** District Judge.

### OPINION

O'SCANNLAIN, Circuit Judge.

We must decide whether the district court properly dismissed various claims brought by a retired Colonel in the California Army National Guard which challenged military personnel decisions.

### I

William Wenger, now retired, served to the rank of Colonel in the California Army National Guard (the "Guard"). He served in the United States Army on active duty for over thirty years, and as a member of the Guard for approximately nine years. On the evening of March 24, 2000, Wenger

** The Honorable Edward C. Reed, Jr., Senior United States District Judge for the District of Nevada, sitting by designation.

was a guest speaker at a Guard social event known as a 'Dining–In' hosted at the Glendale Armory by the officers of the 3–160th Infantry Battalion, 40th Infantry Division. After the dinner concluded, some of the event's attendees stayed for certain 'entertainment'—two (civilian) female strip dancers performed.[1]

At some time before the Dining In incident, Wenger's name had been submitted for promotion to the rank of a General Officer. Wenger's promotion awaited Federal recognition by the Department of the Army in Washington, D.C. when the Dining–In occurred. Shortly after the Dining–In, the Guard initiated a preliminary investigation into the dancing incident. Pending the investigation, on April 13, 2000, the Adjutant General for the State of California initiated a suspension of favorable personnel actions against Wenger (known as placing a "flag" on Wenger's file), which had the effect of suspending proceedings on Wenger's promotion.

After initiating its investigation, the Guard requested that Wenger's personnel file be returned from the Pentagon to the State of California pending completion of the investigation. As a result of that request, the Department of the Army Inspector General's Office ("DAIG") opened an inquiry into the Dining–In. The Guard also informed the Army War College, where Wenger had taught for three years, of the flag; thereafter, the War College informed Wenger that he would not be asked to return to teach.

On May 18, 2000, Wenger provided written demand to the California Adjutant General, requesting that the flag on his record be removed; the request was denied.

On June 8, 2000, Wenger filed suit in this action, seeking, *inter alia,* temporary and permanent relief ordering the Guard (1) to end the investigation, if it was not already ended; (2) to remove the flag from his record; and (3) to inform the DAIG and the Army War College the investigation was improvidently initiated as to Wenger and, in any event, had ended and the flag was removed. The Guard moved to dismiss the suit pursuant to Federal Rule of Procedure 12(b)(6). It also sought a protective order staying discovery until the court ruled on its Rule 12(b)(6) motion to dismiss. Wenger moved for a preliminary injunction. Wenger realized that he would be forced into statutorily-mandated retirement (in Guard parlance, "ROPA'd out") at the end of September, 2000, unless he was under consideration for promotion.[2] He

1. The parties dispute the extent of Wenger's involvement with the dancers. Viewed in the light most favorable to Wenger, *see Mier v. Owens,* 57 F.3d 747, 750 (9th Cir.1995), his complaint indicates that he was unaware of the dancers' planned performance and that, immediately upon seeing them, he left the building, accompanied by Major Marty Spann. Indeed, Wenger avers that he suggested to Major Spann that he "put a stop to" the dancing.

2. Since as far back as 1954, the armed services have adhered to an "up or out" policy, requiring individuals who have served for some specified amount of time in one rank in the National Guard without being promoted to the next rank to retire. The Act that first adopted this policy was the Reserve Officer Personnel Act of 1954, ch. 1257, 68 Stat. 1147, or "ROPA"—hence, "ROPA'd out."

Public Law 103–337, 108 Stat. 2951, which enacted the current mandatory retirement provisions for army colonels (codified as amended at 10 U.S.C. § 14507), provided that

a reserve officer of the Army ... who, on the effective date of this title—... is subject to placement on the reserve active-status list of the Army ..; and ... holds the reserve grade of colonel, ... shall continue to be subject to mandatory transfer to the Retired Reserve ... under section 3851 ... of title 10, United States Code, as in effect on the day before the effective date of this title.

therefore asked the court to enjoin the Guard from retiring him during the pendency of his suit. The court granted the protective order, but denied the preliminary injunction. On September 20, 2000, the court granted the Guard's 12(b)(6) motion to dismiss.

The district court entered judgment on September 22, 2000. Wenger timely appealed. On September 27, 2000, he sought an injunction barring the Guard from retiring him pending his appeal; the district court denied the injunction.

When September 30 came, the flag on Wenger's file continued to prevent him from being considered for promotion. Accordingly, Wenger was ordered retired from the Guard as a Colonel as of October 1, 2000.

## II

The district court concluded that Wenger's claims challenged non-reviewable military personnel decisions, and thus were nonjusticiable under *Mindes v. Seaman,* 453 F.2d 197 (5th Cir.1971), as adopted by this Circuit, *see Wallace v. Chappell,* 661 F.2d 729 (9th Cir.1981), *rev'd on other grounds sub nom. Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983).

▮ Under the *Mindes* test as modified by this Circuit, a person challenging a military decision generally must satisfy

two threshold elements before a court can determine whether review of his claims is appropriate. "An internal military decision is unreviewable unless the plaintiff alleges (a) a violation of [a recognized constitutional right], a federal statute, or military regulations; and (b) exhaustion of available intraservice remedies." *Khalsa v. Weinberger,* 779 F.2d 1393, 1398 (9th Cir.), *reaff'd,* 787 F.2d 1288 (1985). If the plaintiff alleges both of these things, a court weighs four factors to determine whether judicial review of his claims is appropriate. These factors include:

(1) The nature and strength of the plaintiff's claim;

(2) The potential injury to the plaintiff if review is refused;

(3) The extent of interference with military functions; and

(4) The extent to which military discretion or expertise is involved.

*Id.* The parties agree that *Mindes* controls actions such as this in which a member of the National Guard challenges a military decision. *See Sebra v. Neville,* 801 F.2d 1135, 1141 (9th Cir.1986) (holding that the *Mindes* test is the appropriate standard to determine whether claims brought by National Guard members are reviewable). They disagree, however, about the result it dictates.

## A

▮ Wenger has sufficiently alleged the first of the *Mindes* threshold factors, "a

---

*Id.* § 1681. Wenger was a Colonel in the Guard when the new law went into effect on October 1, 1996, *see* Pub.L. 103–337 § 1691(b); accordingly, his mandatory retirement was governed by the former 10 U.S.C. § 3851, which provided that:

> Each officer in the reserve grade of colonel ... shall, 30 days after he completes 30 years of service ... *or* on the fifth anniversary of the date of his appointment in his current reserve grade, whichever is later ... be transferred to the Retired Reserve, if he is qualified and applies therefor....

*Id.* § 3851(a)(1) (emphasis added).

September 30, 2000, marked Wenger's five-year anniversary of holding the rank of Colonel without receiving a promotion. Thus, under law, Wenger was to be retired on September 30, 2000, unless he was under consideration for promotion. *See id.* § 3851(b)("Each officer who has been recommended for promotion, and who would otherwise be removed from an active status under this section, shall be retained in that status until he is appointed or refused appointment to the next higher grade.").

violation of [a recognized constitutional right], a federal statute, or military regulations...." *Khalsa,* 779 F.2d at 1398. He alleges that the Guard violated his "Constitutional rights to due process for the protection of his good name and reputation."

Admittedly, Wenger has not alleged the second threshold factor, that he "exhaust[ed] ... available intraservice remedies." *Khalsa,* 779 F.2d at 1398. However, he asserts that this Circuit's law excuses this omission. In the past, we have concluded that there are four circumstances in which exhaustion is not required: (1) if the intraservice remedies do not provide an opportunity for adequate relief; (2) if the petitioner will suffer irreparable harm if compelled to seek administrative relief; (3) if administrative appeal would be futile; or (4) if substantial constitutional questions are raised. *See Muhammad v. Secretary of Army,* 770 F.2d 1494, 1495 (9th Cir.1985). Wenger alleges that his case fits the first and third of these circumstances. He asserts that appeal to the Army Board for the Correction of Military Records (ABCMR) cannot afford him adequate relief and, indeed, would be futile, because he has been forced to retire, and the ABCMR cannot order either his reinstatement in the Guard, or his rehiring by the Army War College. *See Christoffersen v. Washington State Air Nat'l Guard,* 855 F.2d 1437, 1442 (9th Cir.1988) (recognizing that the Naval equivalent of the ABCMR'has no power to force [state] to reinstate appellant[ ] in [state's] Guard);

*see generally* 10 U.S.C. § 1552 (setting forth power of correction of records); 32 C.F.R. § 581.3 (establishing ABCMR). The district court agreed. And while the Guard contends that the ABCMR could reinstate Wenger in active federal reserve status, it cites only *Christoffersen,* which holds the opposite. We therefore conclude that Wenger's failure to exhaust administrative remedies is, indeed, excused.

Accordingly, we proceed to the next step of the *Mindes* inquiry: the weighing of the four *Mindes* factors.

**B**

The district court concluded, after weighing the *Mindes* factors, that "[a]ll four factors of the *Mindes* test weigh against review of [Wenger's] claim." Wenger disagrees.

**1**

Wenger first argues that the "nature and strength of the [his] claim," *Khalsa,* 779 F.2d at 1398, weigh in favor of review. As noted above, Wenger alleges that the Guard violated his "Constitutional rights to due process for the protection of his good name and reputation." Wenger cites *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) for the proposition that where the State attaches a "badge of infamy" to the citizen, due process comes into play. He concludes that under this passage, injury to his reputation violates the Due Process Clause of the Fourteenth Amendment. He bases his argument principally on Shakespeare's *Othello*[3] and California state

---

**3.** In *Othello,* which Wenger quotes in his reply brief, villain Iago extols the import of one's reputation as follows:
Good name in man and woman, dear my lord,
Is the immediate jewel of their souls:
Who steals my purse steals trash; 't is something, nothing;

'T was mine, 't is his, and has been slave to thousands;
But he that filches from me my good name
Robs me of that which not enriches him
And makes me poor indeed.
William Shakespeare, Othello, act 3, sc. 3.

**1074**

tort law.[4]

■■■ Whatever the content of California tort law, injury to reputation standing alone does not violate the Due Process Clause of the Fourteenth Amendment; one's "interest in reputation" standing alone "is neither 'liberty' nor 'property' guaranteed against state deprivation without due process of law." *Paul v. Davis*, 424 U.S. 693, 712, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *see id.* at 701, 96 S.Ct. 1155 (explaining that "[t]he words 'liberty and property,' as used in the Fourteenth Amendment, do not in terms single-out reputation as a candidate for special protection over and above other interests that may be protected by state law"); *see also Siegert v. Gilley*, 500 U.S. 226, 234, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (stating that the "decision in *Paul* ... turn[ed] ... on the lack of *any* constitutional protection for the interest in reputation" standing alone) (emphasis added); *Peloza v. Capistrano Unif. Sch. Dist.*, 37 F.3d 517, 523 (9th Cir.1994) ("In *Siegert* ..., the Court laid to rest the notion that reputation alone is a sufficient interest to give rise to due process rights.") (citation omitted). Rather, due process protections apply only if a plaintiff is subjected to "stigma plus'; i.e., if the state makes a charge against [a plaintiff] that might seriously damage his standing and associations in the community," and "1) the accuracy of the charge is contested, 2) there is some public disclosure of the charge, and 3) it is made in connection with the termination of employment or the alteration of some right or status recognized by state law." *Llamas v. Butte Community College Dist.*, 238 F.3d 1123, 1129 (9th Cir.2001).

Wenger's claim must fail because he admits that no charges were ever brought against him, and no disciplinary action was ever taken. Moreover, Wenger was retired in due course as required by law, and he has not alleged that the Guard made any negative statements in connection with his discharge.[5] *See benShalom v. Secretary of Army*, 489 F.Supp. 964, 972(E.D.Wis.1980) (finding no due process interest infringed where plaintiff's "discharge was honorable, and there was no public disclosure by the Army of the reasons for her discharge" because "[t]o support a 'liberty' interest claim, the petitioner would be required to show that her discharge was based upon 'an unsupported charge which could wrongfully injure [her reputation]' ") (citing *Arnett v. Kennedy*, 416 U.S. 134, 157, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974)). Accordingly, because Wenger has failed to demonstrate any

**4.** Of course, this court is not obliged to follow either California tort law or the dictates of Shakespearean protagonists in undertaking a Federal Due Process analysis. Indeed, the members of this Court's bar ought to be grateful for the latter. *See, e.g.,* William Shakespeare, Henry VI, part 2, act 4, sc. 2 (protagonist suggests "The first thing we do, let's kill all the lawyers").

**5.** Wenger argues that there was 'publication of defamatory material' when (1) the Guard informed the Army War College of the flag on Wenger's record, and (2) the Guard informed the Department of the Army Inspector General's Office (DAIG) of the flag, and asked for return of Wenger's file. Regardless of whether these acts might constitute defamation under California tort law, Wenger has not demonstrated that either violated his due process rights. First, there was no 'charge" made against him. Second, there was no "public disclosure"—as the district court recognized, both of these disclosures were made to other branches of the military, not to the public. And third, neither was made in connection with termination of Wenger's employment, or the alteration of some right recognized by state law, by the Guard. Indeed, although Wenger was not asked to continue teaching at the Army War College, there is no evidence that the College published reasons for his nonrenewal—and even if it did, no one from the College has been made a party to this lawsuit.

"stigma"—let alone the required "plus"—he has failed to demonstrate infringement of his due process rights. Absent an allegation of "stigma plus," Wenger's only remedy is state defamation law. *See Paul,* 424 U.S. at 701, 96 S.Ct. 1155 (explaining that the Fourteenth Amendment is not "a font of tort law to be superimposed upon whatever systems may already be administered by the States").

Because Wenger cannot sustain his complaint of a constitutional violation, the first *Mindes* factor weighs against review of his claim. *See Christoffersen,* 855 F.2d at 1443 (concluding that "the first *Mindes* factor does not favor reviewability" where an appellant's "constitutional claims are meritless").

### 2

Wenger next asserts that "[t]he potential injury to [him] if review is refused," *Khalsa,* 779 F.2d at 1398, militates in favor of review. He contends that allegations of participating in salacious entertainment could negatively impact his employment status beyond the normal incidents of a standard military discharge.[6] We find this argument unpersuasive, however, because Wenger was not retired on account of any such allegations. He was retired because the law required his retirement. *See supra* note 2. And nothing relating to his retirement would put anyone on notice that Wenger was the subject of any investigation—and again, no charges were brought against him as a result of the investigation. Because Wenger has not pointed to any significant potential injury that judicial review of his case could obvi-

ate, the second *Mindes* factor militates against reviewability.[7] *See Sandidge v. Washington,* 813 F.2d 1025, 1027 (9th Cir. 1987) (concluding that the second *Mindes* factor weighs against reviewability where a plaintiff "has left military service, and his claims of adverse impact on other job opportunities are speculative").

### 3

The third and fourth *Mindes* factors, "[t]he extent of interference with military functions" and "[t]he extent to which military discretion or expertise is involved," *Khalsa,* 779 F.2d at 1398, are generally considered together. *See, e.g., Gonzalez v. Department of Army,* 718 F.2d 926, 930 (9th Cir.1983).

Wenger argues that both favor reviewability because he seeks review not of a military personnel decision, but of the Guard's affirmative misconduct in denying him due process "while actively seeking 'to tar' him." Wenger misses the point. As the Guard observes, Wenger's claims ask a court to decide what should be done when an officer who *might* otherwise have been promoted is present at an incident where misconduct occurs, and an investigation of the event ensues. Such matters go to the heart of military discretion.

In the past, we have emphatically denied invitations to review military personnel decisions in circumstances similar to those in the present case. For example, in *Gonzalez,* a commissioned officer in the Army alleged that he was improperly denied promotion because of racial discrimination.

---

6. Wenger also contends that his forced retirement in the face of unresolved charges of sexual misconduct is not a mere demotion or discharge. However, it is difficult to square this argument with the twin facts that (1) no charges were ever brought against Wenger, and (2) no disciplinary action was ever taken, and he was retired in due course as required by law.

7. Indeed, Wenger specifically disavows any notion that he is concerned about economic injury. He unambiguously declares that his claims "are not about money, or a lost promotion, or a lost teaching position. Rather, he seeks only 'the protection (and vindication) of his reputation....'"

We denied review under *Mindes*. In analyzing the third and fourth *Mindes* factors, we explained that

> [t]he interference with the Army if appellant's claims were reviewed would be significant. The officers who participated in reviewing appellant's performance would have to be examined to determine the grounds and motives for their ratings.... In short, the court would be required to scrutinize numerous personnel decisions by many individuals as they relate to appellant's claim that he was improperly denied promotion. This inquiry would involve the court in a very sensitive area of military expertise and discretion.

*Id.* at 930. Accordingly, we concluded that "[t]he third and fourth factors ... counsel[ed] against review of appellant's claims." *Id.*

Like Gonzalez, Wenger claims that misconduct by the Guard cost him a promotion. To determine whether a flag was appropriately placed on Wenger's record, and whether the investigation of the Dining In incident was conducted properly, a court would have to review all the details of the placement of the flag and the conduct of the investigation. Thus, as in *Gonzalez,* review in this case would require a court to scrutinize numerous decisions made by various individuals, and would necessarily "involve the court in a very sensitive area of military expertise and discretion." *Id.* Accordingly in this case, as in *Gonzalez,* the third and fourth *Mindes* factors weigh against reviewability. *See also Christoffersen,* 855 F.2d at 1444 (concluding that the final two *Mindes* factors weigh against judicial review of retention decisions for Washington National Guard members) (citing *Dilley v. Alexander,* 603 F.2d 914, 919 (D.C.Cir.1979) (concluding that deference to military discretion is at its height when personnel decisions such as discharge are challenged), *as amended,* 627 F.2d 407 (1980)).

## C

■ As the district court concluded, none of the *Mindes* factors favors reviewability of Wenger's claims. *See, e.g., Sebra,* 801 F.2d at 1142 (denying review where "[t]he nature and strength of [plaintiff's] substantive claim is weak; his injury is not severe; and the potential for interference with essential military prerogatives, if we reviewed this case on the merits, would be great"). We therefore hold that the district court was correct to dismiss them.

## III

Wenger next argues that, *Mindes* notwithstanding, he is entitled to assert equitable estoppel against the Guard. He contends that the Guard should be estopped from imposing the flag on Wenger's record because it conducted its investigation in bad faith and violated Wenger's right to due process to protect his good name. This claim is without merit.

■ Wenger's equitable estoppel argument is a transparent attempt to recast his Due Process argument so as to avoid *Mindes*. Wenger rightly notes that in this Circuit, "the *Mindes* doctrine [does not] ... bar equitable estoppel against the military." *Watkins v. United States Army,* 875 F.2d 699, 706 (9th Cir.1989) (en banc). He also argues that his case meets the threshold requirements for asserting equitable estoppel against the government, i.e., he contends that (1) he has established affirmative misconduct going beyond mere negligence, and (2) the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage by imposition of the liability. *Id.* at 707.

■ Even assuming that is correct, however, Wenger cannot prevail on this theory because he has no claim for equitable estoppel. A claim for equitable estop-

pel lies only where the party to be estopped has engaged in conduct that causes justifiable reliance by the party asserting the claim. *See Carrillo v. United States,* 5 F.3d 1302, 1306 (9th Cir.1993) ("An essential element of any estoppel claim is that the party asserting the estoppel must rely to its detriment on the misrepresentation.... Thus, ... [plaintiff] ... [must] show that [ ]he relied to [his] detriment on the government's alleged misconduct.") (citation omitted). Wenger has not shown—and he cannot show—that he relied in any way on the Guard's alleged misstatements made in connection with the investigation of his conduct at the Dining–In. Indeed, this lawsuit demonstrates that not only did he not rely on any such mistatements, he affirmatively challenges their veracity. Thus, Wenger's equitable estoppel claim must fail.[8]

### IV

Wenger's remaining claims fail with the dismissal of his suit; we deal with them summarily. He contends that the district court erred in granting a protective order to the Guard, which barred Wenger from conducting additional discovery pending resolution of the Guard's motion to dismiss. We have held, however, that "[a] district court may ... stay discovery when it is convinced that the plaintiff will be unable to state a claim for relief." *Wood v. McEwen,* 644 F.2d 797, 801(9th Cir.1981) (per curiam). We therefore find no error in the district court's grant of the protective order.

Wenger also contends that the district court erred in denying him a preliminary injunction to prevent his statutorily-mandated retirement. We have explained, however, that in order to obtain a preliminary injunction, "a party must establish either: (1) probable success on the merits and irreparable injury, or (2) sufficiently serious questions going to the merits to make the case a fair ground for litigation with the balance of hardships tipping decidedly in its favor." *Baby Tam & Co. v. City of Las Vegas,* 154 F.3d 1097, 1100 (9th Cir.1998). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *United States v. Nutri-cology, Inc.,* 982 F.2d 394, 397 (9th Cir.1992). Because we conclude that the district court correctly dismissed Wenger's claims as non-reviewable—and thus, that the probability of Wenger succeeding on his claims

---

**8.** *Jablon v. United States,* 657 F.2d 1064 (9th Cir.1981), on which Wenger relies, is not to the contrary. In that case we cited the Fifth Edition of Black's Law Dictionary in defining "equitable estoppel," which that source defines as "The doctrine by which a person may be precluded by his act or conduct ... from asserting a right which he otherwise would have had...." *Id.* at 1068(citing Black's Law Dictionary 483 (5th ed.1980)). That excerpt was sufficient for purposes of the analysis in *Jablon. See id.* (distinguishing "equitable estoppel" from "promissory estoppel"). But it is incomplete.

The Fifth Edition of Black's gives content to this initial statement by explaining that equitable estoppel reflects "[t]he effect of voluntary conduct of party whereby he is precluded from asserting rights against another *who has*

*justifiably relied upon* such conduct and changed his position so that he will suffer injury if the former is allowed to repudiate the conduct." Black's Law Dictionary 483 (5th ed.1980) (emphasis added). The most recent version of Black's is in full accord. *See* Black's Law Dictionary 571 (7th ed.1999) (defining "equitable estoppel" as "[a] defensive doctrine preventing one party from taking unfair advantage of another when, through false language or conduct, the person to be estopped *has induced another person to act in a certain way,* with the result that the other person has been injured in some way") (emphasis added). Wenger thus has no claim for equitable estoppel; although he alleges misconduct by the Guard, he does not allege misconduct of the kind that gives rise to such a claim.

was zero—we find no error in the district court's denial of a preliminary injunction.

## V

The confluence of circumstances that prevented Colonel Wenger from being promoted to a General Officer in the Guard, including his attendance at the Dining In event, the subsequent investigation of the incident, and the law governing mandatory retirement, is indeed unfortunate. But "[t]o permit judicial review of the internal military decisions at issue here would seriously impede the military in performance of its vital duties." *Christoffersen*, 855 F.2d at 1444. Because reviewing Wenger's claims "would involve the court in a very sensitive area of military expertise and discretion," we decline his request to do so. *Gonzalez*, 718 F.2d at 930.

**AFFIRMED.**