**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EMILIANO SANTIAGO,
           *Petitioner-Appellant,*

v.

DONALD H. RUMSFELD, Secretary of
Defense; LES BROWNLEE, Secretary
of the United States Department of
the Army (Acting); RAYMOND
BYRNE, Acting Adjutant General of
the Oregon National Guard; DAVID
DORAN, Captain, Detachment One,
Company D, 113 Aviation Unit
Commander,
           *Respondents-Appellees.*

No. 05-35005

D.C. No.
CV-04-01747-OMP

ORDER
AMENDING
OPINION AND
DENYING
PETITION FOR
REHEARING AND
PETITION FOR
REHEARING EN
BANC AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Oregon
Owen M. Panner, Senior Judge, Presiding

Argued and Submitted
April 6, 2005—Seattle, Washington

Filed May 13, 2005
Amended September 28, 2005

Before: William C. Canby, Jr., Richard C. Tallman, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Canby

13677

**COUNSEL**

Steven Goldberg, Goldberg, Mechanic, Stuart & Gibson, LLP, Portland, Oregon, for the petitioner-appellant.

H. Thomas Byron, III, Attorney, Appellate Staff Civil Division, Department of Justice, Washington, D.C., for the respondents-appellees.

**ORDER**

The opinion filed in this case on May 13, 2005, and reported at 407 F.3d 1018, is amended as follows:

At page 1022, right column, first new paragraph: modify the first full sentence so that it states: "It is inappropriate, however, to imply an intent to exclude when the contract itself specifies that many laws, only partially listed, affect the enlistment and that unlisted contingencies may cause an alteration in the contract's agreed-upon terms."

At page 1022, right column, first new paragraph, to page 1023: delete the material following the citation to *Crane* and accompanying parenthetical (deletion to begin with "Santiago's enlistment contract states . . ." ) to the end of the paragraph on page 1023 (deletion to end with . . . quoted clause of the enlistment contract.").

At page 1023, left column, first new paragraph: At the beginning of the paragraph, delete "In any event" and capitalize the following word "the."

At page 1023, left column, first new paragraph: modify the second sentence of the paragraph before the block quotation so that it states: "The contract contains a section with the general heading 'PARTIAL STATEMENT OF EXISTING UNITED STATES LAWS' and is introduced by a passage stating:".

At page 1023, right column, after the paragraph carried over from the left column (the paragraph ending . . . trumped the contrary terms of an enlistment contract)"), add the following new paragraphs:

> The statute that authorized the stop-loss order, 10 U.S.C. § 12305, was enacted in 1983. It therefore was one of the federal laws to which Santiago's enlistment contract was subject when he entered it. As more fully discussed in the next section of this opinion, section 12305(a) authorized the President to suspend the laws relating to separation of any member of the armed forces under specified conditions of national emergency. This presidential power was properly delegated to the Assistant Secretary of the Army for Manpower and Reserve Affairs, who entered the stop-loss order suspending the separation laws on November 4, 2002. The order was disseminated to personnel on November 21, 2002. *See* MIL-PER MESSAGE No: 03-040, TAPC-PDT-PM

(hereinafter "MILPER 03-040"). It was therefore the congressionally-authorized implementation of § 12305, a statute that was in effect at the time Santiago signed his enlistment contract, that caused his term of enlistment to be extended. The contract recognized that federal statutes would apply to the enlistment.

It is true that, at the time of Santiago's enlistment, the emergency conditions specified by Congress in section 12305 for suspension of the separation laws did not yet exist. Those emergency conditions have since come to pass, however, and their existence is not contested on this appeal. That being the case, Congress by section 12305 has authorized the suspension of separation laws. This application of pre-existing federal law does not violate the terms of Santiago's enlistment contract.

Santiago's enlistment contract contains an even more explicit warning:

> " 'Laws and regulations that govern military personnel may change without notice to me. Such changes may affect my status, pay, allowances, benefits, and responsibilities as a member of the Armed Forces **REGARDLESS** of the provisions of this enlistment/reenlistment document.

Enlistment Doc. § C, ¶ 9(b). The congressionally-authorized suspension of the separation laws qualifies as a "change" in the law within the meaning of this clause. Without the suspension of those laws, Santiago would have been entitled to be separated in due course at the end of his term of enlistment. With the laws suspended, he could be held under alert and ordered to active duty beyond the term of his enlist-

ment. We conclude that the suspension qualifies as one of the changes in law that Santiago's enlistment contract provided for in § C, ¶ 9(b). That provision permits the application of the suspension to Santiago regardless of the term of enlistment specified elsewhere in his contract.

At page 1023, right column, in the last sentence before heading of Section C: change "stop-loss regulation" to "stop-loss order."

At page 1024, in the paragraph that continues immediately after the first block quotation and accompanying citation, delete the first full sentence and the first four words of the next sentence (beginning "Pursuant to this statutory authority . . ." and ending . . . The stop-loss policy provides") and substitute the following:

> Pursuant to this statutory authority, properly delegated from the President, the Assistant Secretary of the Army for Manpower and Reserve Affairs, Reginald J. Brown, executed on November 4, 2002, the stop loss order suspending the laws governing separation for Army National Guard units. This stop-loss policy was implemented on November 21 in a directive stating:

With these amendments, the Clerk shall file the attached amended opinion.

The panel has unanimously voted to deny the petition for panel rehearing. Judges Tallman and Rawlinson have voted to deny the petition for rehearing en banc, and Judge Canby has so recommended.

The full court has been advised of the petition for en banc rehearing and the amendments to the opinion herein. No judge

of the court has requested a vote on the petition for rehearing en banc. Fed. R. App. P. 35(b).

The petition for panel rehearing and the petition for rehearing en banc are denied. No further petitions for panel or en banc rehearing will be entertained.

---

## OPINION

CANBY, Circuit Judge:

Emiliano Santiago, a sergeant in the Army National Guard facing immediate deployment to Afghanistan, appeals from the district court's denial of his petition for a writ of habeas corpus. Santiago's eight-year enlistment in the Guard was due to expire on June 27, 2004, but shortly before that date his enlistment was extended by a "stop-loss" order when his unit was alerted prior to being ordered to active service. Santiago challenges this application of the government's "stop-loss" policy on the ground that it violates his enlistment contract and is unauthorized by statute. He also asserts a due process claim. We affirm the district court's denial of the petition because we conclude that the stop-loss order was authorized by 10 U.S.C. § 12305(a), and that it neither violated Santiago's enlistment agreement nor his right to due process of law.[1]

---

[1] Amicus curiae John Doe attempts to assert statutory and constitutional arguments not raised by Santiago or the government. We follow our general rule in declining to address these arguments not raised by the parties. *See, e.g., Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 719 n.10 (9th Cir. 2003) ("In the absence of exceptional circumstances, which are not present here, we do not address issues raised only in an amicus brief."). We note that Doe is currently pursuing his own federal suit challenging the stop-loss policy. *See Doe v. Rumsfeld*, No. 05-15680, *appeal from* CIV-S-04-2080-FCD-KJM (E.D. Calif.).

## I.  *Factual Background*

Santiago enlisted in the Army National Guard on June 28, 1996, when he was eighteen years old. He enlisted for a term of eight years. After his enlistment, Santiago completed basic training and advanced individual training, after which he was released from active duty. Since that time, Santiago has been participating in monthly weekend training activities as part of his commitment to the Army National Guard. Santiago currently serves as a sergeant in his Pendleton, Oregon, unit.

Santiago is an Aircraft Petroleum Specialist—a refueler. He tests petroleum products for safety and then refuels Army aviation equipment. On the civilian side, Santiago lives with his wife in Pasco, Washington, where he works as an electronic technician at Pacific Northwest National Laboratory (which is operated by Battelle Memorial Institute for the Department of Energy).

On April 17, 2004, the Oregon National Guard received a "mobilization alert order" from the Army National Guard. The order directed the unit stationed in Pendleton to "prepare for a mobilization into federal active service," but specified that "[t]his is an alert order only" and "[t]he official mobilization order may mobilize less than authorized strength." In May 2004, the commander of Santiago's company "announced to the soldiers that the unit was going to deploy, and that the entire unit was under stop loss."

In June 2004, when Santiago's eight-year term was due to expire, Santiago attended a weekend training session. Santiago "assumed that the weekend training that he attended . . . was his last weekend duty." On June 11, however, Santiago learned that his enlistment would not end on June 27—the original termination date of his contract—because he was subject to the stop-loss order.

In October 2004, Santiago's unit received an order to mobilize for active duty. Pursuant to the mobilization order, Santi-

ago and his unit were instructed to mobilize on January 2, 2005, and depart for Fort Sill, Oklahoma, shortly thereafter for six weeks of training, followed by deployment to Afghanistan for one year in support of "Operation Enduring Freedom."

Santiago retained counsel to challenge the involuntary extension of his enlistment under the stop-loss policy. Santiago's attorney wrote a letter to Santiago's unit commander requesting that Santiago be released from further service on the ground that he had fulfilled his contractual obligations. Santiago's lawyer explained that if no "confirmation of Sgt. Santiago's discharge [is received] within two weeks . . . this letter constitutes Sgt. Santiago's attempt to exhaust administrative remedies prior to filing suit to enforce his rights."

The Oregon Military Department replied by letter to Santiago's lawyer, stating that "[a]s a result of the unit alert, your client's ETS [estimated termination of service] date was changed to 24 December 2031 and it is scheduled to remain so until his unit is removed from alert status or until demobilization is completed."[2] The letter also directed that "[r]equests for waivers/exceptions to reserve component unit stop loss should be forwarded through the chain of command." After learning about the waiver policy, Santiago concluded that it would be futile to seek a waiver or exception. Santiago testified by declaration that his civilian supervisor was "not willing to request an exception to my deployment based upon a 'negative national security impact' on my employment." He also concluded that he could not make a claim of personal hardship beyond that which other members of his unit were forced to endure.

In January 2005, Santiago reported to Fort Sill to begin his

---

[2]The government asserts that the 2031 date is purely for administrative convenience and bears no relation to Santiago's actual separation date.

six weeks of training in preparation for deployment to Afghanistan.

## II.   Procedural History

In November 2004, Santiago filed a petition for writs of habeas corpus and mandamus, and for declaratory relief, in the United States District Court for the District of Oregon. He moved for a temporary restraining order and preliminary injunction. The parties stipulated that the hearing on the preliminary injunction was to serve as a bench trial on the permanent injunction, to expedite appellate review. The district court dismissed the petition for writ of habeas corpus and entered judgment for the federal defendants denying all relief. Santiago promptly appealed.

## III.   Discussion

### A.   Justiciability and Exhaustion

The district court assumed for purposes of its decision that Santiago's claims met the requirements for reviewability of military decisions under *Wenger v. Monroe*, 282 F.3d 1068, 1072 (9th Cir. 2002) (applying the rule of *Mindes v. Seaman*, 453 F.2d 197 (5th Cir. 1971)). The district court also assumed for purposes of decision that Santiago had sufficiently exhausted his administrative remedies. The government suggests that we make the same assumptions for purposes of this appeal, and we follow that suggestion. *Wenger* and *Mindes* set forth a prudential rule, not a limitation on our subject-matter jurisdiction. *See Winck v. England*, 327 F.3d 1296, 1299 (11th Cir. 2003). Exhaustion of administrative remedies, when not made mandatory by statute, is similarly a prudential doctrine. *See Acevedo-Carranza v. Ashcroft*, 371 F.3d 539, 541 (9th Cir. 2004). We therefore proceed to the merits.

### B. Enlistment Contract[3]

**[1]** Enlistment contracts, with exceptions not relevant here, are enforceable under the traditional principles of contract law.[4] *See Jablon v. United States*, 657 F.2d 1064, 1066 & n.3 (9th Cir. 1981) (noting that contract principles apply when an enlistee seeks release from the military because of an alleged misrepresentation in the enlistment contract); *Johnson v. Chafee*, 469 F.2d 1216, 1219-20 (9th Cir. 1972) (enforcing an agreement to extend an enlistment period based on contract principles); *Taylor v. United States*, 711 F.2d 1199, 1205 (3d Cir. 1983) (noting that "enlistee status does not invalidate the contractual obligation of either party or prevent the contract from being upheld, under proper circumstances, by a court of law") (citation and alteration omitted).

Santiago relies on the provision of his contract specifying an eight-year term and contends that it requires his separation at the end of that period. He acknowledges that the contract spells out some instances in which his enlistment can be extended (for example, during a declared war), but insists that the extension under the present circumstances, in an alert during an emergency declared by the President, is not among them. He relies on the interpretive doctrine of *expressio unius est exclusio alterius* to support his view that the failure to include a provision for a particular contingency, after specifying others, implies a negative. *See, e.g., Barnes v. Indep.*

---

[3]The district court's interpretation of a written contract presents a question of law that we review *de novo. See, e.g., Flores v. Am. Seafood Co.*, 335 F.3d 904, 910 (9th Cir. 2003).

[4]Exceptions have been created for issues related to military pay or benefits due to the unique nature and characteristics of military service. *See Borschowa v. Claytor*, 568 F.2d 616, 617 (9th Cir. 1977) (holding that habeas relief is unavailable for breach of an enlistment contract when the "breach consists wholly of the non-payment of money"); *cf. Bell v. United States*, 366 U.S. 393, 401 (1961) (holding that "common-law rules governing private contracts have no place in the area of military pay").

*Auto. Dealers Ass'n of Cal. Health & Welfare Benefit Plan*, 64 F.3d 1389, 1393 (9th Cir. 1995).

It is inappropriate, however, to imply an intent to exclude when the contract itself specifies that many laws, only partially listed, affect the enlistment and that unlisted contingencies may cause an alteration in the contract's agreed-upon terms. *See United States v. Crane*, 979 F.2d 687, 690 (9th Cir. 1992) ("[T]he maxim *expressio unius* is a product of logic and common sense and is properly applied only when the result is itself logical and sensible.").

**[2]** The enlistment contract clearly contemplates that the terms of enlistment are subject to existing federal laws and regulations that may not be spelled out in the contract. The contract contains a section with the general heading "PARTIAL STATEMENT OF EXISTING UNITED STATES LAWS" and is introduced by a passage stating:

> Many laws, regulations, and military customs will govern my conduct and require me to do things a civilian does not have to do. The following statements are not promises or guarantees of any kind. They explain some of the present laws affecting the Armed Forces which I cannot change but which Congress can change at any time.

Enlistment Doc. § C, ¶ 9. There is no question, therefore, that the parties to the contract understood and intended that many laws and regulations not set forth in the contract would govern Santiago's service, and the reference to changes in the law simply made clear that even subsequently enacted, as well as pre-existing, law would apply. In so providing, the contract was reflecting well-established rules of law applicable to enlistment contracts. *See Winters v. United States*, 412 F.2d 140, 144 & n.6 (9th Cir. 1969) (holding that a statute applies to preexisting enlistment contracts notwithstanding contrary language in the contract and noting unanimity of courts on the

issue); *Antonuk v. United States*, 445 F.2d 592, 598-99 (6th Cir. 1971) (holding that a federal statute, enacted subsequent to enlistment, trumped the contrary terms of an enlistment contract).

**[3]** The statute that authorized the stop-loss order, 10 U.S.C. § 12305, was enacted in 1983. It therefore was one of the federal laws to which Santiago's enlistment contract was subject when he entered it. As more fully discussed in the next section of this opinion, section 12305(a) authorized the President to suspend the laws relating to separation of any member of the armed forces under specified conditions of national emergency. This presidential power was properly delegated to the Assistant Secretary of the Army for Manpower and Reserve Affairs, who entered the stop-loss order suspending the separation laws on November 4, 2002. The order was disseminated to personnel on November 21, 2002. *See* MILPER MESSAGE No: 03-040, TAPC-PDT-PM (hereinafter "MILPER 03-040"). It was therefore the congressionally-authorized implementation of § 12305, a statute that was in effect at the time Santiago signed his enlistment contract, that caused his term of enlistment to be extended. The contract recognized that federal statutes would apply to the enlistment.

**[4]** It is true that, at the time of Santiago's enlistment, the emergency conditions specified by Congress in section 12305 for suspension of the separation laws did not yet exist. Those emergency conditions have since come to pass, however, and their existence is not contested on this appeal. That being the case, Congress by section 12305 has authorized the suspension of separation laws. This application of pre-existing federal law does not violate the terms of Santiago's enlistment contract.

**[5]** Santiago's enlistment contract contains an even more explicit warning:

> Laws and regulations that govern military personnel may change without notice to me. Such changes may affect my status, pay, allowances, benefits, and responsibilities as a member of the Armed Forces **REGARDLESS** of the provisions of this enlistment/reenlistment document.

Enlistment Doc. § C, ¶ 9(b). The congressionally-authorized suspension of the separation laws qualifies as a "change" in the law within the meaning of this clause. Without the suspension of those laws, Santiago would have been entitled to be separated in due course at the end of his term of enlistment. With the laws suspended, he could be held under alert and ordered to active duty beyond the term of his enlistment. We conclude that the suspension qualifies as one of the changes in law that Santiago's enlistment contract provided for in § C, ¶ 9(b). That provision permits the application of the suspension to Santiago regardless of the term of enlistment specified elsewhere in his contract.

**[6]** Consequently, we conclude that the military stop-loss policy does not violate the terms of Santiago's enlistment contract. The next question we must address is whether the stop-loss order as applied to Santiago was authorized by statute.

## C.   Section 12305

Article I, section 8, clause 14 of the Constitution grants Congress the power to "make Rules for the Government and Regulation of the land and naval Forces." Congress exercised this power, and the laws applying to the various segments of the armed forces are now codified in Title 10 of the United States Code. We conclude that, under the circumstances of this case, the military's stop-loss policy does not exceed the

statutory authority conferred on the President by 10 U.S.C.
§ 12305(a).**5**

The parties do not dispute that the purpose of reserve com-
ponents "is to provide trained units and qualified persons
available for active duty in the armed forces." 10 U.S.C.
§ 10102. Nor do they dispute that "[i]n time of national emer-
gency declared by the President . . . or when otherwise autho-
rized by law, an authority designated by the Secretary
concerned may, without the consent of the persons concerned,
order any unit, and any member not assigned to a unit orga-
nized to serve as a unit, in the Ready Reserve . . . to active
duty for not more than 24 consecutive months." 10 U.S.C.
§ 12302(a). The President declared a national emergency on
September 14, 2001, in response to the terrorist attacks in
Pennsylvania, at the World Trade Center, and on the Penta-
gon. *See* Proclamation No. 7463, 66 Fed. Reg. 48,199 (Sept.
14, 2001). The President simultaneously delegated to the sec-
retaries of the armed services the authority to order reserves
to active duty. *See* Exec. Order No. 13223, 66 Fed. Reg.
48,201-48,202 (Sept. 14, 2001).

We must resolve a narrow question: whether Congress has
delegated to the President the authority to apply the stop-loss
policy to an individual whose enlistment contract expires after
a mobilization alert but prior to a call to active duty. We con-
clude that the stop-loss policy is authorized by the plain lan-
guage of section 12305. *See Robinson v. Shell Oil Co.*, 519
U.S. 337, 340 (1997) ("Our first step in interpreting a statute
is to determine whether the language at issue has a plain and
unambiguous meaning . . . .").

[7] Section 12305 authorizes the executive branch to imple-
ment a stop-loss policy in order to prevent retirement or sepa-

---

**5**We review *de novo* the district court's interpretations of statutes and
regulations. *See United States v. Ani*, 138 F.3d 390, 391 (9th Cir. 1998).

ration of reserve members who are essential to national security:

> Notwithstanding any other provision of law, during any period members of a reserve component are serving on active duty pursuant to an order to active duty under authority of section 12301, 12302, or 12304 of this title, the President may suspend any provision of law relating to promotion, retirement, or separation applicable to *any member of the armed forces* who the President determines is essential to the national security of the United States.

10 U.S.C. § 12305(a) (emphasis added). Pursuant to this statutory authority, properly delegated from the President, the Assistant Secretary of the Army for Manpower and Reserve Affairs, Reginald J. Brown, executed on November 4, 2002, the stop-loss order suspending the laws governing separation for Army National Guard units. This stop-loss policy was implemented on November 21 in a directive stating:

> Generally, all enlistments, reenlistments, extensions, and periods of service for [Army National Guard] soldiers who are members of units *alerted or ordered to active duty* . . . are extended until further notice. . . . This applies to [Reserve Component] *units that are mobilized or have been alerted, but not yet mobilized*, at the time this message is published, and to [Reserve Component] units that are alerted or mobil[iz]ed after this message is published.

MILPER 03-040, ¶ 5 (emphasis added). Because his National Guard unit was alerted prior to his scheduled separation date, the stop-loss policy clearly applies to Santiago. The question is whether the policy is authorized by section 12305(a).

Santiago's central contention is that section 12305(a) authorizes the President to delay separation only of members

of the reserve components who *are on active duty.* Because his enlistment would have expired during the period of alert but before his unit was ordered to active duty, Santiago contends that the statute does not authorize application of the stop-loss order to him.

**[8]** Santiago's interpretation of section 12305(a) is not supported by the statute's plain words. The limiting clause, "during any period members of a reserve component are serving on active duty pursuant to an order to active duty under authority of section 12301, 12302, or 12304 of this title," refers only to the *period of time* during which the President may exercise the power conferred by section 12305(a). That condition is met because the President declared a national emergency in September 2001 and invoked his authority to order reserve units to active duty under section 12302. *See* Proclamation No. 7463, 66 Fed. Reg. 48,199.[6] The district court found that members of the Army National Guard have been serving on active duty pursuant to this authority since October 2001. The temporal condition for exercise of the President's power under section 12305(a) accordingly has been met.

**[9]** The actual operative power conferred on the President by section 12305(a)—the power to suspend the laws governing promotion, retirement or separation—may be exercised with regard to "any member of the armed forces who the President determines is essential to the national security," not merely those who are on active duty.[7] Had Congress intended

---

[6] There is no dispute that the declaration of national emergency has been renewed each year since 2001, most recently on September 10, 2004. *See* 69 Fed. Reg. 55,313.

[7] Santiago does not challenge, nor do we presume to review, the President's discretionary determination that Santiago and the members of his unit are essential to the national security of the United States. *See* 10 U.S.C. § 12305(a). Apart from any such challenge, Santiago does assert that, as a practical matter, his duties could easily be performed by others. Santiago's commander, however, submitted a declaration that Santiago's services were critical because his unit was already short on refuelers, and Santiago's absence would impose duty overloads on the other refuelers.

to limit the President's power under section 12305(a) so that he could suspend the laws relating only to those members of the armed forces on active duty, it would have been a simple matter for Congress to say so in the statute. It did not.

Section 12305(a) is not irrational when read according to its plain meaning. As the government points out, the temporal limitation to a period when reserves have been called to active duty under sections 12301, 12302 or 12304 makes sense because call-up of reserve units under those three statutes ordinarily requires formal declarations or specified conditions of national emergency. In times of national emergency resulting in the activation of reserve units, it is rational to authorize the President to take special measures to ensure the services of other members of the armed forces whom he deems to be essential to national security. That is what Congress has done in the plain words of section 12305(a).

[10] Legislative history does not compel a contrary interpretation of the statute's plain language.[8] The Senate Report's brief reference to the new legislation enacting section 12305(a) says that "the President would be authorized to extend the enlistment or appointment of essential regular and reserve personnel serving on active duty . . . ." S. REP. No. 98-174 (1983), *reprinted in* 1983 U.S.C.C.A.N. 1081, 1099. The House of Representatives adopted the Senate provision, describing it as follows in its Conference Report:

---

[8]"Although the Supreme Court has advised that recourse to legislative history is not necessary where a statute's plain meaning is clear, the Court does suggest that we review the legislative history to ensure that there is no clearly contrary congressional intent." *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 884 (9th Cir. 2001) (en banc); *see also Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980) ("[T]he starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.").

The Senate bill contained a provision [ ] that would authorize the President, during a time of crisis or national emergency, to extend the enlistment or appointment of essential regular and reserve personnel serving on active duty regardless of the normal separation dates for those individuals.

H.R. CONF. REP. NO. 98-352, *reprinted in* 1983 U.S.C.C.A.N. 1160, 1176. It is true that these references say nothing about extending periods of enlistment of members of units that have been alerted for mobilization, but not yet ordered to active duty. There is no reason, however, to construe these minimal references of congressional history as demonstrating a clear intent contrary to the plain words of section 12305(a). The congressional committee statements are accurate as far as they go: section 12305(a) does authorize the President to extend the enlistments of those on active duty. The committee reports do not express an intent to make that authority exclusive, precluding the President from extending enlistments of members of the reserve alerted for, but not yet ordered to, active duty. We do not read the congressional history as sufficient to demonstrate a clear congressional intent contrary to the plain words of section 12305(a). We conclude, therefore, that section 12305(a) authorized the application of the stop-loss order to Santiago at a time when his enlistment had not yet expired and his unit was alerted for, but had not yet been ordered to, active duty.[9]

---

[9]At oral argument, Santiago relied on *Cherokee Nation of Okla. v. Leavitt*, 125 S.Ct. 1172 (2005), for the proposition that, when a statute may reasonably be interpreted either of two ways, a court should avoid an interpretation that "would undo a binding governmental contractual promise." *Id.* at 1182. We conclude that *Cherokee Nation* is inapplicable for two reasons: (1) the plain words of section 12305(a) require the interpretation we adopt; and (2) Santiago's enlistment contract expressly contemplates that statutes and regulations may apply and change the contract, so there is no direct conflict between our interpretation of section 12305(a) and the contract.

**D.   Due Process**

[11] Santiago next argues that his constitutional right to due process of law has been violated by the government's failure to provide adequate notice that his enlistment could be extended involuntarily for reasons not specified in his enlistment contract.[10] As our earlier discussion of Santiago's contractual claim makes clear, however, Santiago's enlistment contract provided notice that subsequently enacted laws and regulations would affect the terms of his contract. Santiago signed an enlistment contract that said "[l]aws and regulations that govern military personnel may change without notice to me." Enlistment Doc. § C, ¶ 9(b). The contract also states that Santiago "may at any time be ordered to active duty involuntarily . . . under any other conditions authorized by law in effect at the time of my enlistment or which may hereafter be enacted into law." *Id.*, Statement of Understanding at ¶ 11. If Santiago's rights under his enlistment contract have not been violated, it is difficult to see how his constitutional claim— which is essentially a variation of his breach of contract claim —can prevail. Under these circumstances, the government's failure to notify Santiago in his enlistment contract of each specific reason that his service might be extended involuntarily does not violate Santiago's due process rights.

Nor does Santiago's "indefinite extension" violate his due process rights. Santiago's new ETS date is December 25,

---

[10]Santiago did not raise this due process argument in the district court. Although we usually do not consider arguments raised for the first time on appeal, *see Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999), we may do so when "the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed." *Briggs v. Kent (In re Prof'l Inv. Props. of Am.)*, 955 F.2d 623, 625 (9th Cir. 1992) (internal quotation omitted). Those conditions are met here, and the government is not prejudiced by our addressing the issue. *See Ariz. Cattle Growers' Ass'n. v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1241 (9th Cir. 2001) (finding no prejudice when party asserting waiver would not have introduced additional facts into the record).

2031, but this date was entered for administrative convenience. The stop-loss policy makes clear that soldiers "will generally be mobilized for an initial period of 12 months, but may be extended for a cumulative period up to, but not to exceed, 24 months."

Accordingly, we reject Santiago's claims that his right to due process of law was violated.

## IV.   Conclusion

We do not minimize the disruption, hardship and risk that extension of his enlistment is causing Santiago to endure. We also accept the fact that his claim not to be subject to the stop-loss order has been brought in complete good faith. For the reasons we have set forth, however, we conclude that the application of the stop-loss order did not breach his enlistment contract or deprive him of due process of law. We also conclude that it was authorized by 10 U.S.C. § 12305(a). The judgment of the district court is accordingly

**AFFIRMED.**[11]

---

[11]Santiago also moved for an injunction pending appeal to forestall his deployment to Afghanistan, scheduled to occur shortly after oral argument of this appeal. We denied that motion by separate order shortly after oral argument on April 6, 2005.